UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
KEVIN SPRINGLE,

                        **Plaintiff,**                **STATEMENT OF**
                                                   **MATERIAL FACTS**
          **-against-**                    **PURSUANT TO**
                                                     **RULE 56.1**
METROPOLITAN TRANSPORTATION
AUTHORITY, NEW YORK CITY TRANSIT,

                        **Defendants.**
-------------------------------------------------------------X

       Defendants New York City Transit Authority (sued herein as "New York City Transit" and hereinafter "Transit Authority") and Metropolitan Transportation Authority ("MTA"), by its attorney, Martin B. Schnabel, General Counsel, Robert K. Drinan, Assistant General Counsel and Gena Usenheimer, Agency Attorney, Of Counsel, submit the following statement of material facts pursuant to Local Court Rule 56.1 of the Civil Rules for Southern and Eastern Districts of New York.

## Background

1. Plaintiff Kevin Springle originally commenced this action in the Supreme Court of the State of New York, New York County on November 18, 2005. Defendant Transit Authority removed the action as of right, pursuant to 28 U.S.C. § 1446 to the United States District Court, Southern District of New York on January 31, 2006 (Copies of the Summons and Complaint ("Complaint") are annexed hereto as Exhibit "A" and a copy of the Notice of Removal is annexed hereto as Exhibit "B").

2.  Springle has been employed by the defendant Transit Authority since December 1985 when he was appointed to the position of Signal Maintainer's Helper.  See Exhibit "C", Springle's deposition at 7.[1]

3.  The evidence establishes that Springle was employed by the Transit Authority and not the MTA.

4.  Springle received several promotions during his employment with the Transit Authority, and in September 2002 he was promoted to the title of Superintendent, Rail Transit Investigations Unit, in the Office of System Safety ("System Safety") (12-13).

5.  Springle was subsequently demoted from this position and it is the circumstances surrounding the demotion, as well as the demotion itself, which are the basis of the instant action.  See generally Exhibit "A".

6.  During the time period relevant to the claims in this action, Springle, who is a person of color (86), reported to Patrick Lavin (21), who is white.  See, Exhibit "A" at 13.

7.  It appears that on Thursday, October 28, 2004, Springle complained to a supervisor at System Safety (William Walter)  about certain decisions he believed Lavin made based on race (99-101).

8.  A meeting was held in System Safety on Friday October 29, 2004, and Springle discussed his complaints about Lavin, namely: a performance review which rated Springle as marginal in one of out eleven possible categories (interpersonal relations), a decision to send Springle to core training, holding staff meetings at a time that excluded Springle, a memo from Lavin which addressed minimum coverage concerns

---

[1] The numbers in parentheses refer to pages of the transcript of Springle's deposition which is annexed hereto as Exhibit "C".

in the unit, Lavin's alleged habit of interrupting Springle, and that Lavin carried Springle's reports to the bathroom (62).

9.  On Tuesday, November 2, 2004, Springle filed a complaint with the Transit Authority's Equal Employment Office ("EEO"), which contained the same allegations which had been made to System Safety four days prior (204-205).

10. In the context and time frame of these complaints, it should be noted that the record contains anecdotes of acerbic remakes made by Springle to his colleagues at work, including: a) an admitted remark that on Wednesday, October 27, the day before filing his complaint against Lavin with System Safety, while discussing a staffing issue with Lavin, Springle referred to excrement (119); and b) an admitted remark at the October 29 meeting with System Safety, in the presence of a vice president and other high level managers, where Springle stated that he would not kiss a part of Lavin's anatomy (204).

11. Springle's EEO charge was investigated by Patrick Damas also a person of color. See Exhibit "D", Damas' deposition, at 78-79.

12. Based on interviews with Springle's colleagues in System Safety, Damas learned that Springle had made statements prior to filing his complaint against Lavin that led Damas to conclude that Springle's complaint against Lavin was knowingly false. See Exhibit "D" at 106.

13. Damas' EEO report recommended that appropriate disciplinary action be taken against Springle. (218-219).

14. The disciplinary charge against Springle alleged that he filed a false report was sustained, resulting in his demotion. See Exhibit "E" Step II Decision.

15. In this action, Springle claims that the incidents which were the subject of his October 29 complaint to System Safety and which were also the subject of his November 2 complaint to EEO were discriminatory, and that his demotion was in retaliation for the complaints.  <u>See</u> Exhibit "A".

16. Plaintiff asserts a Title VII claim (42 U.S.C. § 2000-e <u>et</u> <u>seq</u>. ("Title VII")), a generalized claim based on 42 U.S.C. § 1981, and two supplemental claims (Article 15 of the New York State Human Rights Law, and Title 8 of the New York City Administrative Code, New York City Human Rights Law).  <u>Id</u>. at par. 2, 3.

17. The evidence establishes that Springle did not file a complaint with the Equal Employment Opportunity Commission, or with other state or local agencies.

18. The Transit Authority submits that the undisputed facts derived from Springle's deposition testimony, as corroborated by the testimony of other witnesses and documents, establish that the incidents which were the subject of the internal complaint were not racially discriminatory.

19. The Transit Authority further submits that the undisputed facts establish that Springle's discipline and demotion were the direct result of an independent investigation by EEO which concluded that Springle filed a false charge against Lavin.  The finding was based on information acquired during the investigation and there is no evidence to suggest that the finding was retaliatory.

20. It is submitted, therefore, that the undisputed facts fail to support a claim of discrimination or retaliation.

## The Facts

a. **Springle's Employment with the Transit Authority**

21. During the following years, Springle was promoted into and through the titles of Signal Maintainer, Maintenance Supervisor in Signals, Level 1, Associate Railroad Signal Specialist, Level 1, and Associate Railroad Signal Specialist, Level 2 (8-9).

22. In September 2002 Springle was promoted to Superintendent in the Rail Investigations Unit, in the Office of System Safety ("Superintendent")(11-13).

23. The Rail Investigations Unit at System Safety responded to and investigated accidents, derailments and collisions in the subways (69, 71).

24. In September 2002, there were five Superintendents in the Rail Investigations Unit: Kevin Springle, Richie Holt, Paul Messina, Jim Merrits and Dennis Lynch (21-22). Kevin Springle and Richie Holt are both persons of color.   The remaining Superintendents were White (86).

25. At the time of Springle's appointment to Superintendent, the five Superintendents reported to Joe Leader, Manager, Rail Investigations Unit.   See Exhibit "F", Lavin's deposition, at 38-9.[2]

b. **Patrick Lavin Replaces Leader as Manager of the Rail Investigation Unit**

26. About a year after his appointed to Superintendent, Leader's position became available; Springle applied and interviewed for the position. (19, 20).

27. Patrick Lavin was selected for the Manager position in September 2003.  See Exhibit at 32.

---

[2] In Lavin's deposition transcript there is a reference to a "Steiger" as the Manager of the Rail Investigations Unit.  This is a typographical error.  Prior to Lavin, Dennis Lynch was the temporary Manager and prior to Lynch, Joe Leader was the Manager of the Unit.

28. After Lavin's appointment to Manager, all five Superintendents in the Rail Investigations Unit, including Springle, reported to him (21).

29. Throughout the relevant dates of this litigation (August 2003 through June 2005), Kennedy, as Vice President, System Safety, had numerous Directors reporting under her, including Ron Alexander, Director of Operations and William Walter, Director of Investigations.  Lavin, as Manager in the Rail Investigations reported directly to Walter.  <u>See</u> Exhibit "G", Kennedy's deposition, at 14-16.

30. In early 2004, Superintendent Dennis Lynch left the Unit.  <u>See</u> Exhibit "F" at 71.  His departure left a vacancy in the Unit.  As Manager, Lavin was involved in the interview process.  <u>See</u> Walter's Declaration at par. 4-6.

31. Lavin initially selected and offered the position to Melvin Oliver, a person of color, who declined the position.  <u>See</u> Walter's Declaration at par. 6.

32. The position was thereafter offered to, and accepted by, John Szurlej.  <u>See</u> Walter Declaration at par. 6.

c. **<u>Springle's Allegations of Race Discrimination</u>**

33. In late October 2004, and early November 2004, Springle made two complaints against Lavin several days apart, which were identical (62, 99-101).

34. Specifically, on Thursday, October 28, 2004, Springle complained about Lavin to Lavin's superior, William Walter, a Director in System Safety (99-101).

35. On Friday October 29, 2004, a meeting was held in System Safety to permit Springle to present his accusations against Lavin (172-73).

36. Present at the meeting were the following individuals: Kevin Springle; Cheryl Kennedy, Vice President for System Safety; William Walter, Director in System

Safety; Ronald Alexander, Director of Operations; James Brownfield, Director, Analysis Review and Development and, Patrick Lavin, Manager (172-173).

37. Springle presented six allegations at the meeting, the same allegations which later became the basis of a written complaint filed on Tuesday, November 2, 2004 with the Equal Employment Office ("EEO")(179,204-205).

38. Springle testified that the six allegations against Lavin, which are also described in his complaint in this action (Exhibit "A", Par. "14"), constituted all the claims of unfair/discriminatory treatment against Lavin based on race (28).   All six of Springle's claims against Lavin were discussed at the October 29 meeting.  (179).

39. The six allegations are discussed in detail below, but it is noted that at the meeting on October 29, Springle admittedly made a crude remark to Lavin which resulted in a performance advisory (198); four days later, on Tuesday, November 2, Springle filed his complaint with EEO (204-205).

40. Witnesses at the meeting testified that Springle rose from his chair and, in an angry tone, said to Lavin that he (Springle) "would not kiss (Lavin's) ass".  See Exhibit "G" at 46; See Exhibit "Q", Bromfield's Investigation of Allegation memo at par. 4; See Exhibit "R", Walter's November 2, 2004 Performance Advisory at par. 2.

41. By memo dated November 5, 2004, Springle opined that he had not been heard correctly.  See Exhibit "S" Springle's Response to Performance Advisory, at par.3.

42. Springle did not deny making a remark at the October 29 meeting, but noted that he had said he would not kiss Lavin's "aft".  Id.

<u>The Six Allegations</u>

1. <u>The Managerial Performance Review</u>

43. Managerial Performance Reports ("MPR") are annual evaluations of managers, such as superintendents, which assess work performance in eleven categories, and which evaluate abilities, skill sets, and on-the-job performance. See Exhibit "I", Springle's MPR.

44. The eleven categories include: budget controls (not applicable to the instant matter), customer service skills, leadership, problems solving and decision making, organizing and planning, team and interpersonal skills, diversity management, safety/environmental management, investigation of rail accidents, preparation of accident reports and coordination and supervision of accident investigations. The manager is also given an overall performance rating for the period of review. Id.

45. On December 29, 2003, Lavin signed an MPR which evaluated Springle's job performance as Superintendent for the 2003 year. Id.

46. Plaintiff was given "excellent" ratings in the categories of problem solving and decision making, organizing and planning, and investigation of rail accidents, and received "good" ratings in customer service skills, leadership, diversity management, safety/environmental management, preparation of accident reports and coordination and supervision of accident investigations. Plaintiff was given a "marginal" evaluation in the team and interpersonal skills category. Plaintiff's overall evaluation was "good". Id.

47. In the category of Team and Interpersonal Skills, Springle was rated "marginal." Id.

48. Springle received an overall evaluation rating of "good." Id..

49. Springle does not object to the overall rating or the more categorical ratings of good or excellent (112).

50. Springle claims that the managerial rating in one category was a racially discriminatory act (129).

51. Many witnesses deposed by Springle were questioned about experiences with Springle.

52. Although largely denied by Springle, the following testimony was offered about interactions with Springle:

   a. Lavin testified that he based Springle's marginal rating in the Team and Interpersonal Skills category on Springle's "abrasive" conduct.  <u>See</u> Exhibit "F" at 64;

   b. Lavin recalled a time when Springle said to him, "if you wanted to know about this derailment, you should have got off your ass and went yourself." <u>See</u> Exhibit "F" at 61;

   c. Lavin recalled an incident in which Springle was asked to make some phone calls and he gave Cheryl Kennedy, Vice President, System Safety, a difficult time about it.  Lavin also recalled an incident where Springle had words with James Bromfield, Director, Analysis Review and Development, about the purchase of a camera.  <u>See</u> Exhibit "F" at 48;

   d. Kennedy, who also signed the MPR (129), had the opportunity to form an opinion as to Springle's competence at his job and testified that Springle was "a very good investigator, very good technically, but he had problems getting along with people.  His interpersonal skills – he had problems in that area". <u>See</u> Exhibit "G" at 112;

e.  On occasion, Kennedy spoke with Leader regarding Springle's team and interpersonal skills.  Kennedy noted that Springle had some problems with other Directors in the unit and opined that she expects her staff to work and communicate with each other and to behave in a professional manner in investigating accidents and otherwise interacting the relevant departments. <u>See</u> Exhibit "G" at 37-39;

f.  Kennedy specifically recalled an incident of inappropriate behavior involving Springle.  The Transit Authority was reviewing subway flagging rules and the project necessitated contacting other transit properties throughout the country to compare flagging rules.  Springle was asked by Joe Leader to call a number of these properties and assist in this project.  According to Kennedy, Springle was uncooperative.  <u>See</u> Exhibit "G" at 38-39;

g.  James Bromfield, Director, Safety Analysis, Review and Development, commented on Springle's interpersonal skills.   Bromfield requested a preliminary report of a rail investigation from the Manager, Joe Leader. Leader told Bromfield to ask one of the investigators in the Rail Unit for the report as it was on the common computer drive and easily accessible. Bromfield asked Springle.  According to Bromfield, Springle said that if Joe Leader did the report, then Joe Leader should have it.  Springle refused to access the report.  Bromfield asked Richie Holt for the report, who provided Bromfield with a copy.  <u>See</u> Exhibit "J", Bromfield's deposition, at 62-63;[3]

---

[3] Due to the length of Bromfield's deposition transcript, only the relevant portions have been annexed hereto as Exhibit "J".  The entirety of the transcript will be provided upon request.

h. Kennedy spoke with Springle about his interpersonal skills. Springle interviewed for a Director's position, which ultimately was given to William Walter. After his interview, Kennedy spoke with Springle and told him that she was impressed with his skills but the need for improvement of his interpersonal skills was one of the reasons he was not selected for the position. See Exhibit "G" at 112-113, and

i. John Szurlej was an experienced track person who was also a Superintendent in the Rail Unit. Springle admits to calling him "green" (126).

53. Springle was asked for his views on the marginal rating for team and interpersonal skills:

Q:   Okay. And do you have any idea why you would have been given an M marginal in [interpersonal] skills?

A:   No, I read this several times and I don't see it on here.

Q:   And do you thing that when Lavin prepared that he could have believed that you needed some training in personal skills?

* * *

A:   I don't know what he believed.

Q:   Do you think you needed any training or improving in team or personal skills?

A:   Anybody could have improved in any way.

Q:   And the answer is?

A:   Same answer.

See Exhibit "C" at 127-128.

54. After the MPR was issued, Springle discussed the evaluation with Lavin (111).

55. Springle testified that Lavin told him he had no problem with his work (111).

56. Springle never heard Lavin make a racial remark or joke, and he never heard anyone else say that Lavin made a racial remark or joke (93).

57. Springle object to the fact that Lavin prepared the MPR in December 2003 for the entire year of 2003 but had been appointed Manager in September 2003.  (110).

58. Springle testified:

> Q:  How much importance to attach to the fact that Lavin had only been on –the –job three months when he prepared this evaluation of your performance?
>
> A:  I had never worked with Mr. Lavin prior to System Safety, so he doesn't know about my team interpersonal skills.  And in a sense with him coming on board to the group I was in, he had to also adjust to us, as we had to adjust to him.  It goes both ways and hopefully we'd meet somewhere in the middle.  So just to say I have an interpersonal problem, I never heard anything before the review.  The first time I heard about this is when I saw this document in front of me, which was on December 29, '03.

See Exhibit "C" at 113.

59. Cheryl Kennedy, Vice President, System Safety, testified that although Pat Lavin drafted the MPR, it was reviewed by both herself as well as Joe Leader, who was the Manager of the Rail Investigation Unit prior to January 2003 until Lavin's appointment in September 2003. See Exhibit "G" at 36-37.

60. Kennedy testified that she agreed with the assessments contained within the entire MPR and that she signed it. See Exhibit "G" at 37.

61. Lavin testified that because Joe Leader was the Director for part of the time period covered by Springle's MPR, he had more knowledge about the individuals reviewed than Lavin.  See Exhibit "F" at 41.

62. Joe Leader signed the MPR, indicating his agreement with the evaluation contained therein (128).

63.  Although Lavin drafted the MPR evaluations for all the Superintendents in the unit, including Springle, he testified that the evaluations were the result of a collaborative effort between himself, Joe Leader, and Cheryl Kennedy.  <u>See</u> Exhibit "F" at 41-42.

64. Springle had no evidence that Leader agreed to the marginal rating because of race (130).

65. At or around the same time that Lavin signed Springle's MPR, he issued MPRs for the rest of the unit.  As part of his review, Lavin also reviewed Superintendent Dennis Lynch covering the period of review for the year 2003.  <u>See</u> Lynch MPR annexed to Walters's Declaration.

66. As in Springle's MPR, Dennis Lynch's MPR evaluated job performance in the ten applicable categories and provided an overall evaluation, and Lynch received ratings of "Good" or "Excellent" in nine out of ten categories.  <u>Id.</u>

67. Lynch received an overall evaluation of "G", indicating a good evaluation.  <u>Id.</u>.

68. Lynch, however, received an "M" indicating a marginal evaluation in the category of "Safety/Environmental Management."  <u>Id.</u>

69. Dennis Lynch's MPR was also signed by Cheryl Kennedy and Joe Leader.  <u>Id</u>

70. Dennis Lynch is a white male. (86)

2. <u>The Core Training Course</u>

71. The final line of Springle's MPR informs, "Mr. Springle will be sent for Core Managerial Training to improve his team and interpersonal skills."  <u>See</u> Exhibit "I".

72. As part of the MPR process, the department is responsible for the development of a performance improvement plan to address the different areas in which an employee may need additional training to help improve his performance.  <u>See</u> Exhibit "G" at 65.

73.  Lavin testified that he wanted Springle to go to the core training course in order to

improve his performance in the area of team and interpersonal skills.  <u>See</u> Exhibit "F"

at 69.

74. Lavin had previously attended this course.  <u>See</u> Exhibit "F" at 12.

75. Springle attended a two week management core training course in March 2004 (130).

76.  In this deposition, Springle stated that the course was a good course (130).

77. Springle was asked whether it was the practice at the Transit Authority that, from

time to time, managers would attend various training courses (131).

78. Springle testified about training in general, and the core training in particular:

> A:  Everyone goes through training, yes.

> Q:  How many training courses have you attended before you had the
> managerial training course?

> A:  I have no idea.

> Q:  More than 20?

> A:  I couldn't tell you.  I wouldn't want to put a number on it.  It's a lot.
> It's a lot.  Some of it's a refresher.  You take the same training over and
> over.

> Q:  Maybe a track training?

> A:  Maybe.

> Q:  Prior to the time that you attended the managerial training course,
> do you know whether anyone you worked with had ever attended
> that course?

> A:  I know Lavin went to the course because I believe he said he did.  I
> don't know if anybody else attended.  I was told that everyone will attend.

> Q:  Okay.  And do you know whether after you attended the course
> whether other superintendents were sent to that course.

A:  When I was scheduled to attend the course, I was the only one scheduled.  When I started questioning it, suddenly everyone else started being scheduled.

Q:  So after you attended the course, other people did go to the course as well?

A:  yeah, but it wasn't like the week after.  It was a considerable amount of time.

Q:  Do you know whether when an employee received an M for a category that the supervisor has to implement some kind of a plan to help the employee with performance?

A:  No, I'm not aware.

Q:  Do you know whether the direction that you attended the managerial course was because you received the M in personal skills?

A:  I don't know that.

See Exhibit "C" at 131-133.

3.  Springle's Alleged Exclusion from Staff Meetings

79. Springle claims he was excluded from staff meetings over the period of time from

September 2003 – shortly after Lavin's appointment to Manager – to October of

2004, when Springle ultimately stopped reporting to Lavin (137).

80. Lavin held monthly staff meetings in the Rail Investigation Unit (136).

81. Staff meetings were generally held in the mornings (139), and lasting from ten to

twenty minutes (136).

82. Superintendents discussed current investigations at the staff meetings.  See Exhibit

"F" at 97.

83. A written record of each staff meeting was created which recorded attendance,

described issues discussed at the meetings, and was subsequently distributed to any

Superintendent who missed a meeting (137-138).  See Exhibit "K", Written Records of Staff Meeting.

84. In the Rail Investigation Unit, one of the five Superintendents worked evenings on the shift known as the "p.m." (138).

85. The Superintendents rotated on the p.m. shifts, which typically lasted for about one week (138-139).

86. Whichever Superintendent working the p.m. shift on the day a staff meeting was held necessarily missed the morning staff meeting (139).

87. Springle acknowledged that it was possible the other Superintendents missed as many as five meetings in the time period from September 2003 through October 2004 due to working the p.m. shift (154).

88. Springle requested that Lavin change the time of the staff meetings to the afternoon to permit the Superintendent working the p.m. to attend the staff meetings (139).

89. Lavin declined to change time of the meetings because, in his view, crises arise throughout the day which made a later meeting less likely.  See Exhibit "F" at 95.

90. Despite this, Springle alleges that Lavin scheduled the monthly staff meetings in the morning so as to specifically exclude him from attending the meetings (154-155).

91. Plaintiff supports this contention solely by reference to his observation that he was the only Superintendent to request that the meeting time change (156).

92. The written records of the staff meeting, annexed hereto as Exhibit "K," establish that Springle was present at eight of the thirteen staff meetings held from September 2003 through October 2004: November 26, 2003; December 17, 2003;  January 9, 2004;

April 27, 2004; May 23, 2004; June 28, 2004; July 26, 2004; August 20, 2004 (147-148).

93. Springle's allegation of being excluded from the staff meetings is based on missing five of thirteen meetings (149-150).

94. According to the attendance recorded on the staff meeting agenda, Holt attended a total of nine out of thirteen meetings, Messina attended ten out of thirteen meetings, and Merritts attended twelve out of thirteen meetings.  <u>See</u> Exhibit "K".

4. <u>October 2004 Staffing Memo</u>

95. On October 15, 2004, Lavin issued a staffing memo to all the Superintendents in the Rail Investigations Unit.  <u>See</u> Exhibit "L", October 15 staffing memo.

96. Lavin testified that he issued the memo because when he arrived at work on October 15, he learned that not one Superintendent in the Rail Unit had reported to work.  <u>See</u> Exhibit "F" at 77-78.

97. Springle testified that during the day, Lavin wanted at least two Superintendents present (78).

98. On October 14, Merritts and Springle were out sick, Holt was out on long term sick leave and Messina took a compensation day.  <u>See</u> October Time Records attached to Britton's Declaration.  Szurlej was scheduled for the p.m. tour.  <u>See</u> Exhibit "F" at 77-78.

99. Springle described the functions of the Rail Investigations Unit:

> Q:    The responsibility of the Superintendent in your group was to investigate accidents, correct?
>
> A:    Yes.
>
> Q:    And do you have to go into the field?

A:      Yes.

Q:      Derailments, other kinds of incidents?

A:      Yes.

<u>See</u> Exhibit "C" at 71.

100. Springle testified that when investigating an accident, a Superintendent would not "go on the tracks by [him]self" (71).

101. Thus, when one Superintendent was present in the office at the time of an accident, such as the p.m. tour, a "back up" would be on duty and would be called from home or a manager would report to the scene (71-72).

102. The October 15, 2004 memo was not the first communication Lavin distributed to the Superintendents in his unit regarding coverage concerns.

103. Throughout 2004, Lavin issued two notices about coverage concerns in the Rail Investigation Unit (73-74).

104. Lavin sent an email to all Superintendents on February 6, 2004, expressing concerns about the lack of sufficient coverage and his directive to maintain minimum coverage in the unit.  <u>See</u> Exhibit "M", February Email.

105. Lavin sent a March 26, 2004 email to all the Superintendents in the unit (81) elaborating on his requirements of minimum coverage in the unit and reiterating Lavin's preference to not have more than two Superintendents scheduled to be off at any given time.  <u>See</u> Exhibit "M".

106. Relevant portions of the March 26, 2004 memo read, "In order to avoid future minimum coverage problems, I am to be notified in advance of any time away from your normal assignment....The maximum personnel allowed off on normal business

days will be two Superintendents…Unless there are extreme circumstances, I want to avoid having more than 2 managers scheduled to be off at any given time."   <u>See</u> Exhibit "N", March Email.

107.   Springle received these emails regarding office coverage from Lavin, which were directed to all the Superintendents in the unit (73-74).

108.   Springle testified that the October 2004 memo and two earlier emails were issued because of him and targeted him because he was black.  Springle testified:

> A:  It's no secret to what the ethnic background of what the other individuals from – you can pull their records and see when they take off sick or any other previously approved absence.  No emails are generated.  No memos are generated.  You can check that yourself and you can check that against my attendance record and check it against the dates of these memos or emails.

<u>See</u> Exhibit "C" at 84-85.

109.   The memos were also directed to Richard Holt (<u>S</u>ee Exhibits "M" and "N") a Superintendent in the Rail Investigations Unit, who is also black (86).

110.   The attendance records relevant to the emails of February 6 and March 26 memo of October 15 reveal:

a.   The February time records reveal that only one Superintendent – Holt- reported for work on February 5, 2004, the day prior to Lavin's February e-mail regarding minimum coverage concerns.  The February time records reveal that Springle, Merritts and Messina were all out of the office on the day prior to Lavin's February 6, 2004 email regarding coverage concerns in the unit.  <u>See</u> February Time Records attached to Britton's Declaration.

b.   Attendance records for the period covering March 20 – April 2, 2004 reveal that Springle and Holt were absent on the day of and on the day prior to the

March 26, 2004 email.  <u>See</u> March Time Records attached to Britton's Declaration.

  c.  The October time records reveal that only one Superintendent out of five – Szurlej who was scheduled to 7 pm tour reported for work on October 15, 2007 and that Springle, Merritts, Holt and Messina were all out of the office on the day the October 15, 2004 email regarding minimum coverage concerns was sent to all Superintendents by Mr. Lavin.  <u>See</u> October Time Records attached to Britton's Declaration.

111. The October 15, 2004 memo issued by Lavin was entitled  "Request for Approved Time Off", and was sent to all the Superintendents in the Rapid Transit Investigation Unit.  <u>See</u> Exhibit "L".

112. The memo advised Superintendents of a change in procedure for requesting approved time off, requiring request for approved time off to be submitted on a bus slip, at least two business days in advance of the requested time off, as well as mandating that all sick notifications must be made a minimum of two hours prior to the Superintendent's tour of duty.  <u>Id</u>.

113. The memo also required all emergency requests for approved time off to have supporting documentation and noted that failure to comply with this procedure will have a negative impact on the rating received on a Superintendent's MPR.  <u>Id</u>.

114. Lavin's concerns in the memo primarily addressed the Superintendents taking emergency leave without documentation to support it.  Lavin stated at his deposition that the memo was not directed towards Springle because Springle was off sick the

day prior to and the day of the memo, his absence was not due to emergency leave. See Exhibit "F" at 111.

115. Springle testified that his concern with the memo was the two hour notice requirement prior to sick leave which he said violated Transit policy of one hour notice, and also that failure to comply with the procedure would have a negative impact on a Superintendent's MPR (73).

116. Springle testified that the memo was written in order to single him out, targeting him presumably because of his race (75).

117. Szurlej testified that when Springle received and read the October 15 memo, he became visibly upset, recalling that Walter had to tell Springle to calm down. See Exhibit "Y", Szurlej's deposition at 23.

118. After receiving the October 15, 2004 leave memo on October 16, Springle complained to Walter, explaining that the two hour notice prior to calling off sick was contrary to the Transit Authority's rules which require only one hour notice (65).

119. Springle explains his anger at having received the leave memo:

> Q:    Were you angry when you read the memo?
>
> A:    Who wouldn't be?  It's clearly a violation of the rules. I've been with the Transit Authority for 21 years.  In my 21 years it's always been one hour.  Other than the rule book revision, which had not happened, where did these two hours come from?
>
> Q:    So you were angry when you read the memo?
>
> A:    Yes.

See Exhibit "C" at 66.

120. On October 28, a memo was issued which amended the October 15, 2004 memo, changing the two hour notice for sick leave to one hour notice.  See generally, Exhibit "O", October 28 Staffing Memo.

121. Springle believe the memo was changed because of the concerns he raised with regard to Transit policy (117).

122. Springle testified that he had no problems with the October 28, 2004 memo (178).

123. Significantly, when asked if Springle ever learned  why the memo was issued he testified:

> A:     Because I called off sick
>
> Q:     Did you ever have a discussion with anyone?
>
> A:     Well, William Walter said that I was out sick and they were short of coverage and I asked him, I said "Well, you were short of coverage. Where were you going to get somebody, even if I gave you six hours notice?  Were you going to manufacture someone or were you going to get someone to come in?"
>
> Q:     Do you know whether on the days, any of the days you were sick, whether the Unit was short of coverage?
>
> A:     Only when I was told when I returned to work.
>
> Q:     What were you told?
>
> A:     That they were short of coverage.

See Exhibit "C" at 68-69.

124. The October memo was the motivating cause of one other event - on Wednesday, October 27, Springle and Lavin met at the elevator near the office, and discussed the memo (117).  See Exhibit "F" at 91-92.  Springle testified:

> Q:     Do you recall whether in that discussion, which I know it possibly could have happened, whether you walked away and made a remark

> to the effect of, I've got a lot of plumbing problems at home, I'll bring you a bag, or words to that effect.

> A:   It didn't happen like that.  He said we were talking about his memo where he wants proof for emergency days off.  I told him, I said I live in a house that the sewer backs up a lot and if you want proof would you want me to bring a bag of that.

<u>See</u> Exhibit "C" at 119.

125.  In this conversation, Lavin told Springle that if he brought him anything other than a

plumbing receipt, Springle's MPR would be negatively impacted by his behavior.

<u>See</u> Exhibit "F" at 93.

5.   <u>Occasionally Lavin Interrupts Springle</u>

126.  Springle claims that when he had spoke to Lavin, Lavin often interrupted Springle,

said "time out", and gestured to make a "T" with two hands (158-160).

127.  Springle alleges that this would happen "every day," "every time we have a

conversation" and that it was "pointless" to say more because in essence, Lavin "shut

down" (158-160).

128.  Springle testified that Lavin only interrupts him when they discussed business related

topics (162).

129.  Springle did not know whether Lavin ever interrupted another Superintendent (163),

noting "He may have.  I didn't see him do it.  I was not paying attention, he was not

speaking to me," but Kennedy and Lavin both testified that Lavin uses the "time out"

expression with others.  <u>See</u> Exhibit "G" at 44; <u>see also</u> Exhibit "F" at 104.

130.  Springle recalled a specific example of this behavior by Lavin:

> No – I could think of one example.  14th Street, the collision at the Bumping stop.  The train operator that was operating the train.  At the time I did not interview the train operator.  So I later asked for an interview.  Everyone said    we already interviewed him.  Yes, but you've interviewed the train operator without knowing a lot more information now that we already know,

so let's call him for another interview and I can interview the train operator. The interview was granted. I got the train operator to come in. I interviewed the train operator. I made notes, took a statement and I was told by Mr. Lavin no, that's not what he said. I said this is what he said. Well, that's not what I meant so now he was going from I'm reading the man's statement exactly what he sand and now that's not what that is. That means something else. But through all this time he would be like no, no, time out, that's not what that means, this means that, that means this, so it was impossible for me to continue the discussion at that point.

See Exhibit "C" at 160-161.

### 6.   Springle Surmised That Lavin Read His Draft Reports In The Bathroom

131.   Springle claims that on three instances Lavin walked toward the bathroom with Plaintiff's draft reports.

132.   Springle prepared drafts reports and reports of rail accidents and incidents. See generally, Exhibit "C" at 164-166.

133.   During the year (September 2003 through October 2004) that Springle reported to Lavin, Springle agreed that he had prepared "many, many reports" (166).

134.   Usually, Springle left drafts reports on Lavin's desk, in an inbox, or on his chair - - "on his chair or someplace noticeable" in or around Lavin's cubicle (166).

135.   Springle provided the following testimony about three occasions where Lavin put Springle's report in his pocket and, Springle surmised, went to the bathroom:

> A:   Whenever I gave him a report which was generally in the mornings, he would take the report, fold it like this, lengthwise, put it in his shirt pocket and he would mention to Jim Merritts who sits right behind him, "I'm taking the kids to the pool". It took me a very long time to know what that meant. I had no idea what that meant. I later found out what that means.
>
> Q:   And how many times did this happen?
>
> A:   I've seen it happen on at least three occasions.
>
> * * *

Q:     On the three occasions, Lavin picked up the report from where you had laid it and folded it in half and put it in his shift pocket? [sic]

A:     He starts to read the report and then he gets up and says to Jim, "I'm taking the kids to the pool", he folded it, put it in his shift pocket and goes off to do his business. [sic]

Q:     Did Lavin use that same phrase on each of the three occasions?

A:     Yes.

Q:     Did you ever see Lavin with any other reports or documents in his shift pocket? [sic]

A:     I don't generally track people when they go use the facilities.

See Exhibit "C" at 164-165, 166-167.

136.   While Springle originally did not know what the phrase "taking the kids to the pool" meant, he came to learn that it means "going to do a number two in the bathroom" (168).

137.   Springle testified that never saw Lavin go into the bathroom with any of his draft reports, but rather he concluded Lavin was bringing the reports into the bathroom because of the phrase he used (179).

d.   **The October 28, 2004 Meeting with Walter**

138.   The very first time Springle raised concerns regarding Lavin subjecting him to racial discrimination was at a meeting with William Walter Springle on Thursday, October 28, 2004 (98-101).

139.   A meeting was held in System Safety on Friday October 29, 2004, at which Springle discussed his complaints about Lavin with the vice president and other high level managers, to permit Springle to present his claims against Lavin (172-73).

e.  **The October 29, 2004 Meeting**

140.  A meeting was held on October 29, 2004 at which Cheryl Kennedy, Ron Alexander, Jim Bromfield, William Walter, Pat Lavin and Springle were present. (172-73).

141.  Springle raised the six claims discussed above (179).

142.  Springle objected to Lavin's presence at the meeting (174).

143.  With respect to the draft reports, Springle described an incident where he handed Lavin a draft report for his review and comment after which Lavin took the report, folded it in half, put it in his pocket and went to the bathroom.  Springle rhetorically asked "what does that tell you?"  No one at the meeting answered and Springle stated that Lavin treated his report like 'shit' (197), <u>See</u> <u>also</u> Exhibit "P", Walter's November 2, 2004 memo to Bromfield at par. 7.

144.  Near the end of the meeting, Springle made a comment to Lavin (198).

145.  Kennedy described the incident: "Kevin became very angry and that Pat that he wasn't going to kiss his ass, and he actually almost came across the table at Pat.  We told him to calm down and that it was inappropriate.  He apologized, and we went on with the meeting," noting further that ". . . it was very obvious in the meeting" that Springle "had a lot of animosity, to the fact that he almost, you know, got up on the table" and "Put his two hands on the table, leaned up across the table and glared at him [Lavin] and said he wasn't going to kiss his ass."  <u>See</u> Exhibit "G" at 46, 54-55.

146.  Bromfield and Walter also described the incident, noting that Springle yelled at Lavin that he wasn't going to "kiss his ass."  <u>See</u> Exhibit "Q", at par. 4; <u>See</u> Exhibit "R" at par. 2.

147.  Plaintiff denied that his voice was loud, that he was angry or that he stood (199-201).

148. Bromfield further documented his objection that throughout the meeting, Springle glared at the attendees and reacted angrily to comments.  <u>See</u> Exhibit "Q" at par. 5.

149. Following the October 29, 2004 meeting Lavin requested Springle report directly to William Walter in the future, noting that it would not be advisable for him and Springle to be on the tracks together.  <u>See</u> Exhibit "F" at 115-116

150. Springle was thereafter directed to report to Walter.  <u>See</u> Exhibit "F" at 116.

151. As a result of Springle's outburst at the meeting, on November 2, 2004, Walter issued a performance advisory.  <u>See</u> <u>generally</u>, Exhibit "R".

152. Walter's Performance Advisory stated that Springle's actions at the October 29, 2004 meeting would be considered in the 2004 MPR evaluation and observed that the failure to conduct himself in a professional manner while dealing with his supervisor(s) or co-workers cold result in disciplinary actions, exclaiming "I'm not going to kiss his ass."  <u>See</u> Exhibit "R" at par. 2.

153. On November 2, 2004, Springle filed a complaint with EEO (204-205).

154. On November 5, 2004, Springle responded to Walter's Performance Advisory in writing:

> I did **not** use loud and abuse language at this meeting.  The statement, " . . .  I'm not going to kiss his ass", is an inaccurate quote.  What I stated was " ' ' ' I'm not going to kiss his aft."  Based on the comments during the meeting, it was obvious that you misheard a word in my statement and I apologized for the confusion.

<u>See</u> Exhibit "S", Springle's Response to Performance Advisory, at par. 3.

155. Springle's response memo concludes:

> In summary, the basis for this Performance Advisory is false, without merit and appeaser to be retaliatory in nature.  It is against NYCT's Equal Employment Opportunity Policy to retaliate against an employee for filing a discrimination complaint.  In addition, this action is forbidden by City, State and Federal Laws.

<u>Id</u> at par. 5.

f.  **Springle and Lavin filed Complaints with the Transit Authority Office of Equal Employment Opportunity**

1.  <u>The Office of EEO</u>

156.  The EEO investigates into allegations and complaints of discrimination with the agencies (38).

157.  The EEO employs investigators, who are required to conduct impartial investigations to determine whether facts exist which support the complaint.  <u>See</u> Exhibit "D" at 15.

158.  An investigation typically includes an interview with the complainant, interviews of any relevant witnesses and a review of relevant documents. <u>See</u> Exhibit "D" at 60.

159.  Investigations are discussed at regular EEO staff meetings attended by all EEO investigators, along with Joel Andrews, Assistant Director for Investigations.  <u>See</u> Exhibit "D" at 61.

160.  As discussed below, Springle and Lavin both filed EEO complaints, and Patrick Damas was assigned to investigate both complaints.  <u>See</u> Exhibit "D" at 78-79; <u>See also</u>, Exhibit "X" Determination of Lavin's EEO Complaint.

161.  Damas explained that it was sometimes necessary to make credibility assessments in order to determine the merits of a complaint. <u>See</u> Exhibit "D" at 38.

162.  Damas testified that when assessing the credibility of witnesses, he considered work record, the person's demeanor, the relationship between the parties whether the person described specific details or generalized, and the consistency of both person's account and all the facts derived from the investigations.  <u>See</u> Exhibit "D" at 39-40, 41-2.

163. In 2005, Naaem Din was the Deputy Director at the Office of Civil Rights.  <u>See</u> Exhibit "T", Din's deposition at 28.

164. As Deputy Director, Din assigned case to and supervised EEO investigators as well as discussed with them the witness interviews and documents reviewed during the investigation.   Din also reviewed investigation reports prepared by EEO investigators.  <u>See</u> Exhibit "T" at 25-26.

165. Generally, before a final determination is issued, the investigative report is reviewed by Din, he discusses with determination the investigator to be certain, that the determination is supported by the facts.  <u>See</u> Exhibit "T" at 26.  If Din agreed with the ultimate determination in an investigator's report, the determination would become final.  <u>Id.</u> 32-33.

166. Joel Andrews, was the Assistant Director for Investigations also supervised investigators and reviewed investigations.  <u>See</u> Exhibit "T" at 31.

167. In 2005, Din was the Deputy Director and Joel Andrews reported to Din.  At that time, there were at least five EEO investigators who reported to Andrews, including Patrick Damas.  <u>See</u> Exhibit "T" at 28-31.

168. Draft investigation reports were reviewed by Andrews and then by Din, at which point, the determination would become final unless Din objected to a conclusion. <u>See</u> Exhibit "T" at 32-33.

169. If Din had concerns, he would have further discussions with the investigator and with the Director of the office.  <u>See</u> Exhibit "T" at 33.

170. When the determination was that probable cause existed to believe a violation has occurred, an EEO confidential report was sent to the department head with a recommendation for appropriate disciplinary action. <u>See</u> Exhibit "T" at 34.

171. EEO is not empowered to recommend a specific disciplinary action, but EEO did offer suggestions such as an employee should be counseled or sent to training, depending on the nature of the violation. <u>See</u> Exhibit "T" at 35.

172. If EEO recommended disciplinary proceedings against an individual, the Department of System Safety and when asked  whether an individual department could decide to not pursue any action at all, or reject EEO's recommendation completely, Kennedy testified that she did not believe so and noted, "I know we would not." <u>See</u> Exhibit "G" at 79.

173. Ultimately, decisions regarding discipline are up to the department head of the relevant department. <u>See</u> Exhibit "T" at 42.

2.  <u>Springle's EEO Complaint Against Lavin</u>

174. On Tuesday, November 2, 2004, Springle filed a complaint with EEO (204-205). <u>See</u> Exhibit "U", Springle's EEO Complaint.

175. The subject of Springle's complaint was Lavin, and Springle asserted, the same six claims he had asserted the Friday before at the System Safety meeting (204-205).

176. At the Office of EEO, Patrick Damas, a person of color, was assigned to investigate Springle's complaint. <u>See</u> Exhibit "D" at 78-79.

177. At the time of Plaintiff's complaint, Damas had worked at EEO for five years. <u>See</u> Exhibit "D" at 46.

178. Damas has a Bachelor of Arts, a Juris Doctorate, a Master of Science and three Master of Arts, as well as Master of Science degree from Cornell in 2005 in Industrial and Labor Relations (See Exhibit "D" at 8-10), and from time to time, Damas has been requested to give EEO training for other units within the MTA agencies. Id. at 52.

179. In the course of the investigation, Springle met with Damas more than once and Springle testified that Damas appeared to be listening and he took notes of the events Springle described (210-211).

180. Damas also met with Lavin, Szurlej, Bromfield, Walter and Merritts while investigating Springle's complaint.  See Exhibit "V", Determination of Springle's EEO Complaint at 7.

181. Damas' investigation file for both the Springle and Lavin complaints contained detailed interview notes and other information relevant to the investigation.  The EEO files are annexed to Andrews' Affidavit.

182. By determination dated June 16, 2005 Damas concluded that there was not reasonable cause to believe that Lavin had committed racist or otherwise inappropriate conduct (207).  See Exhibit "V" at par. 3.

3.  Lavin's EEO Complaint against Springle

183. On December 17, 2004 Lavin filed an EEO Complaint against Springle which alleged that Springle had created a racial, hostile work environment.  See Exhibit "W", Lavin's EEO Complaint, also included in Lavin's EEO file attached to Andrews' Affidavit.

184. Damas was also assigned to investigate Lavin's Complaint.  <u>See</u> <u>generally</u> Exhibit "X".

185. More specifically, Lavin alleged that Springle demonstrated extreme resentment, anger and hostility towards him.  <u>See</u> Exhibit "W".

186. Lavin also included in his EEO complaint that Szurlej told Lavin that Plaintiff had told a co-worker (Ramon Paez) in early October 2004 that he was going to "screw Pat Lavin by playing the race card."  Lavin included this information in his EEO complaint resulting in Damas interviewing Szurlej.  <u>See</u> Exhibit "W".

187. During the investigation, Damas learned that Lavin had not heard, and no one else had ever heard Springle make racial remarks.  <u>See</u> Springle's EEO File attached to Andrews' Affidavit.

188. By determination dated June 16, 2005, Damas concluded that there was no reasonable cause to believe that Springle had created a racially hostile environment. <u>See</u> Exhibit "X" at par. 3.

189. The determination also contained a finding that Springle's complaint was knowingly false reading, "the investigation revealed that springle violated Rule 8(a) of NYCT's Rules and Regulations that prohibits NYCT employees from knowingly making a report containing false statements."  Damas' report further indicates, "the Division found that Springle filed complaints with OSS management and the Division knowing that he claim of race discrimination contained in the complaints was false."  <u>Id</u>. at par. 4.

4. <u>Damas' Investigation</u>

190. At his interview with Damas on January 18, 2005, Lavin relayed what John Szurlej has told him. <u>See</u> Lavin's EEO file attached to Andrews' Affidavit.

191. Szurlej, a Superintendent in the Rail Unit, had told Lavin about a Springle/Ramon Paez discussion. <u>See</u> Exhibit "Y" at 14-15. Paez was a Superintendent in the Bus Investigation Unit, but had a cubicle near Springle's and Paez's cubicle. <u>See</u> Exhibit "J" at 76-77.

192. Paez told Szurlej that in early October 2004, Springle told Paez that he was going to "screw Pat Lavin by playing the race card." <u>See</u> Exhibit "D" at 106-107.

193. Damas interviewed Szurlej. Damas recalled his conversation with Mr. Szurlej:

> A:    He said Mr. Paez had told him that, you know, Mr. Springle had said I'm going to screw Pat Lavin by playing the race card.
>
> Q.    Okay.
>
> A.    And that Mr. Paez had told him that, you know, he had told Mr. Springle, you know, you know, that, you know, Pat is not a racist, what are you talking about, you know, you shouldn't do that, you know, there's  - - race has nothing to do with this or this - - or something to that effect.
>
> Q.    Mr. Szurlej also told me that Mr. Paez - - Mr. Paez seemed disturbed by the whole conversation he had with Springle.
>
> A.    I said Mr. Szurlej, you know, he told you this, and what did you do about it? He said I didn't do anything about it. I said why not. He said because, you know, I don't want [sic] to get involved with this stuff. I said okay. Pretty much, you know. He doesn't want to get involved. I said, you know, I asked him why didn't you go to, like, a supervisor or something and say hey, this guy's saying he's going to do this, or you know, you know, he was, like, I don't want to get - - you know, I don't even want to be here. I don't want to get involved with this stuff. Pretty much that was his, you know.

<u>See</u> Exhibit "D" at 106-107.

194. Szurlej was deposed and testified to his conversation with Paez and the reasons it was relayed to Lavin:

Q.      Did you report the substance of the discussion you had with Mr. Paez to anybody?

A.      Not immediately.  Some - - a few weeks had gone by and we - - I had – myself and pat Lavin were driving in the car together, following up on an incident in Brooklyn, I believe it was somewhere by 38th Street yard.

       Mr. Lavin had received a phone call from someone in the office, and stating that Mr. Springle - - that he had to go down to speak to someone in EEO.

       I had forgotten about the conversation with Mr. Paez, but at that particular moment, in the car together, then I recalled it.  I had told Mr. Lavin, I said well, you know, I don't know if it was true or not, I said, but I had a conversation with Mr. Ramon Paez some weeks earlier where Mr. Springle had told him that he was going to file a racial complaint in order to have you, Pat Lavin - - (Paez was interrupted bat this point by Springle's attorney).

See Exhibit at "Y" at 14-15.

195.  The conversation between Szurlej and Paez occurred between November and December of 2004.  See Exhibit "Y" at 17.

196.  Following his interview with Szurlej, Damas interviewed Paez who confirmed Szurlej's statements regarding the conversation with Springle.  See Exhibit "D" at 111.

197.  Paez testified as to the subjects discussed at his meeting with Mr. Damas:

A.      Generally he asked me, Mr. Damas, if I had any kind of conversations with Mr. Springle about the issues involved in him and Mr. Lavin.  General stuff like that.

Q.      Anything else you can recall?

A.      I recall telling Mr. Damas a couple of conversations that Pat – excuse me – Mr. Springle and I had.  With the specifics.  I do recall telling Mr. Damas that Kevin had told me that he was going to use the racial cared to file a complaint against Mr. Lavin.  As he told me that, he gestured with his hand on his skin (indicating). Mr. Springle is African-American, so he would gesture like this (indicating), as he said he was going to use the racial card.

And I do recall another specific thing that I told Mr. Damas, was Kevin was told me that he was going to screw Pat Lavin, gesturing with his hand, pumping this way (indicating), up and down or sideways, however you want to, but basically (indicating).

Those two points were the most specific things I remember discussing with him.

Couple of things that are now coming to mind that I told Mr. Damas that Kevin had told me, was Kevin had told me that he was upset because he would give his draft reports to his manager, who would in turn would go to the men's room to, I assume, to review the draft report.

Another point that Kevin said to me that I told Mr. Damas was Kevin felt that – he felt slighted or left out by not attending certain staff meetings that his group was holding.

Those are the general things I recall.

See Exhibit "Z" at 21-23.

198. Springle denies making the statements to Paez (208).

199. Damas' June 16, 2005 report indicates that rule 8A of the New York City Transit Authority rules and regulations prohibits Transit Authority "employees from knowingly making a report containing false statements."  Damas' investigation concluded that Springle filed complaints with management and the division "knowing that complaints contained a false statement" (218-219).

200. EEO's recommendation was that the Office of System Safety should take appropriate disciplinary action against Springle for filing a false report (219).

201. The EEO recommendation that disciplinary action be taken against Springle was based on the conclusion that Paez's account was credible and that Springle had violated on of the New York City Transit's policies.  See Exhibit "D" at 126-127.

202. Springle testified that he has no evidence or reason to believe that Damas came to his conclusion for some other reason other than the review the facts as he knew them (221-222).

203. Din reviewed the report that was written by Damas and had discussions with Damas as well as Andrews regarding the investigation and report which found Paez credible.  See Exhibit "T" at 44, 63.

204. Din agreed with Damas' conclusion that Springle filed a false report.  Din 64-65.

205. Din testified that dating back as far as 1998 and subsequent to Springle's complaint, that neither he, nor anyone in the Office of EEO, determined that an employee filed a complaint that was knowingly false.  See Exhibit "T" at 65-66.

5.  The Disciplinary Action Against Springle

206. At her deposition, Vice President of the Office of System Safety was asked to explain the disciplinary procedures and process applied to managers such as Springle.  See Exhibit "G" at 18-19.

207. Kennedy explained that whenever issues of potential discipline arose, she had Jim Bromfield seek guidance and recommendation from Office of Labor Relations.  See Exhibit "G" at 19.

208. As the Director of Safety Analysis Review and Development ("SARD"), part of Bromfield's responsibilities included handling employee relations issues and union relation issues.  See Exhibit "J" at 26.  Bromfield describes his involvement with labor relations as seeking counsel from labor relations with a specific fact pattern and asking for guidance in the drawings up of charges.  See Exhibit "J" at 30.

209. Labor Relations, which is responsible for the vast majority of disciplinary actions for the Transit Authority, could advise whether discipline was appropriate and if so, the appropriate range of penalties.  See Exhibit "G" at 23; See also Exhibit "J" at 37.

210. Sometimes Labor Relations would provide a range of options for discipline and/or penalty, but typically the best option was identified. See Exhibit "G" at 23.

211. In such situations, as occurred with Springle, Bromfield reported the advice from Labor Relations to Kennedy. See Exhibit "J" at 162.

212. While the ultimate determination as to whether to pursue disciplinary charges and the penalty sought rested with an employee's manager (See Exhibit "J" at 39), the manager would, in Bromfield's experience, accept the advice from Labor Relations. Id. at 43-44.

213. Kennedy testified that she makes disciplinary decisions in concert with Labor Relations.  See Exhibit "G" at 80, 85.

214. If Kennedy determined that discipline would be pursued, written charges were prepared by Labor Relations.  See Exhibit "G" at 24.

215. Once a disciplinary charge is prepared, the managerial disciplinary policy is initiated through a notification of the employee of the charge.  Next, a step one meeting held, where the employee can offer evidence in response to the charge. See Exhibit "AA", Walter's deposition at 14.

216. An employee can appeal the step one determination to step two, and Kennedy could meet with the employee to discuss the charges. See Exhibit "G" at 26-27, 33.

217. Kennedy testified that she considered the EEO recommendation that Springle be disciplined for filing a false report to have been thorough and that she should take the action requested.  <u>See</u> Exhibit "G" at 90-91.

218. After receiving Damas' EEO report recommending disciplinary action against Springle, Kennedy instructed Bromfield to speak with Labor Relations.  <u>See</u> Exhibit "J" at 150.

219. Bromfield recalls that Labor Relations considered the filing of a false report a very serious violation which warranted discipline.  <u>See</u> Exhibit "J" at 158.

220.  The potential disciplinary options offered by Labor Relations for such a serious violation included dismissal or suspension.  <u>See</u> Exhibit "J" at 158-159.

221. Nevertheless, because Springle was a long term employee with a good record, Labor Relations recommended that a demotion was the most appropriate penalty.  <u>See</u> Exhibit "J" at 161-162.

222. Bromfield reported the recommendations of Labor Relations to Kennedy, and she followed the recommendations. <u>See</u> Exhibit "J" at 162-163.

223. The charges alleged that Plaintiff violated NYCT Rule 8A, which prohibits filing a knowingly false EEO Complaint.  <u>See</u> Exhibit "H", Notice of Disciplinary Charges at par. 2.

224. Labor Relations prepared written disciplinary charges against Springle.  <u>See</u> Exhibit "J" at 164.

225.  Springle was served with charges, and he requested a step one meeting (227, 230).

226. Springle, Bromfield, Walter (See Exhibit "AA" at 39) and Alan Bennett, an attorney from Labor Relations, were present at the step one meeting held on July 18, 2005 (231).

227. The meeting allowed Springle the opportunity to respond to the disciplinary charges and to present evidence in response to the charges.  See Exhibit "AA" at 39.

228. Springle read a prepared statement to Walter which indicated that Springle felt he was being discriminated against by Lavin based on the same six claims which were the basis of his EEO charge (231-232).

229. Springle felt that it was unfair that he was disciplined for filing an EEO complaint while Lavin, who also filed an EEO complaint, was not disciplined (232).

230. Walter told Springle that a statement from a third person, who apparently heard Springle say that he was going to "screw" Lavin was some of the evidence that distinguished his complaint from Lavin's complaint (232).

231. Walter asked Springle about the statement and whether there was any reason someone would say that about him.  Springle responded that he and another person at work had had a disagreement (232).

232. At his deposition, Springle explained that in January 2005, he and Paez had a disagreement about radio equipment.  According to Springle, Paez had given him certain radio equipment.  Later, Paez heard that Springle had sold the equipment. Paez asked for money for the equipment, but Springle who had not sold it, returned the equipment (233-234).

233. Thereafter, Walter investigated into the additional information Springle presented regarding Paez and determined that Paez was credible, and that Paez did not lie about the statement because of the misunderstanding.  See Exhibit "AA" at 51-52.

234. Walter relied upon the EEO report, which he found very compelling, the interview with Paez (See Exhibit "AA" at 52-54), and in the step one decision Walter rejected Springle's position and sustained the disciplinary charge (237).

235. By letter dated August 4, 2005 Springle appealed the step one decision to Kennedy and she held a meeting with Springle and his attorney later that month. (237).

236. Kennedy sustained the charge and recommended penalty in a step two decision dated September 8, 2005 annexed hereto as Exhibit "E", and also a memo dated September 8, 2005 from Jim Bromfield, implementing the step two decision (240).

237. As a result of the sustained disciplinary charge, Springle was demoted from the title of Superintendent to Associate Railroad Signal Specialist, Level 2 (240).